case is POSCO v. United States 19-1213. Attorney DeFrancisco, you've reserved five minutes of your time for rebuttal, correct? Correct, Your Honor. Okay, we're ready to go if we want. Good morning, Your Honors. May it please the Court, Robert DeFrancisco on behalf of Plaintiff Appellant, New Court Corporation. Your Honors, this is the second of three flat-rolled steel cases involving Korea and whether electricity was provided for less than adequate remuneration. This past June, this Court in New Court v. U.S., a decision involving corrosion-resistant steel, this case involves cold-rolled steel, this Court's determined that it is no longer sufficient for commerce to rely on preferentiality standard alone when measuring benefit. The Court in that case did not explicitly reach the issue of whether commerce's cost analysis considered the correct level of cost when evaluating adequate remuneration. Unlike that case, the record in this case is substantially more developed on this issue and commerce was fully on notice regarding the need to consider the actual cost associated with generating the electricity that was distributed. As such, we believe the exhaustion issue that existed in that case does not exist in this case. Can I just double-check something? I guess I came into this argument thinking that the exhaustion question doesn't exist here for a reason quite independent of whether the record would have supported an exhaustion argument, but the government simply, in this case, never raised an exhaustion question. That's correct, Your Honor. So exhaustion's out of the case because it's waived by the government. Correct. We would agree with that, yes. And frankly, in this case, I don't think there's any question that we did not fully develop the idea that Commerce Department should be looking at how the cost of electricity was generated and how it flowed through the system when measuring whether the price that KEPCO charged the steel producers was adequately remunerated. And the only thing that, if I remember right, the issues and decision memo says on that is essentially a sentence that says, wrong question, that's not relevant. That's correct, Your Honor. Which isn't much of an explanation. Correct, Your Honor. We don't believe that that was a sufficient analysis. In this case, unlike the last case, we presented substantial amounts of additional evidence documenting why the cost of electricity or the production cost associated with the electricity at the generator level did not flow all the way through the system and is not reflected. There was additional pieces of evidence in this case that wasn't on the record in the last case so far as the system marginal price, as Your Honors may recall, in that case reflects the variable cost of electricity generated. It doesn't include the capacity price or the fixed cost. I thought that there is some, I'm going to be very vague about this, some multiplier in the description of the KPX pricing so that it's not only variable and a different multiplier, if that's the right term, perhaps different depending on whether the energy comes from nuclear generation or from coal or whatever else there might be. That's exactly right, Your Honor. So it's not just the variable cost. Correct, you're correct. The point we were making was that there were multiple pieces of evidence that if you look, if the Commerce Department had looked at it, demonstrated that the price of the electricity that was charged wasn't adequately remunerated. So, again, going to the question of the variable cost alone. In this case, we put on the record the system marginal price, the marginal price, the variable cost of electricity that's on KPX's schedule for the period of review. It identifies the hour of the variable cost and the month at every hour of the day. This is for the period that's under review? Correct, Your Honor. Correct, Your Honor. In fact, well, I can direct Your Honor to the actual appendix site where you can find it. It is appendix 12864, and in that you can see it's a table, and it identifies all the different marginal prices, the variable cost. It does not include the capacity price, okay? In our case brief, we had said to the department, look, if you just take the marginal cost, just the variable cost alone in this table, and you aggregate it together and take the average, there's small variations on a monthly basis, on an hourly basis, but even just the variable cost alone was substantially higher than the price KEPCO charged to the steel producers. That was one piece of additional evidence that exists on this record that didn't exist in the last record, and another piece of evidence that exists on this record that didn't exist in the last record was in this case, one of the respondents actually has its own electricity generating facility. It generates electricity and sells it into the grid. It sells it to KPX, and then it purchases the same electricity back off the grid from KEPCO, and the price of the electricity that they sold it into the grid at is substantially higher than the price of the electricity they purchased. Where is that in the record? Certainly, Your Honor. So it wasn't referenced in our case brief or in the appendix, but it is in the record. It's public record 324, confidential record 381, and that is a December 4, 2015. Is it in the joint appendix that we have in front of us? It is not in the joint appendix. It is in the record. So if you go to the record numbers, it's public record 324 and confidential record 381. It's a December 2015 document. It's a response to a questionnaire that we had put on the record. This is weeks before the Department's preliminary determination in this case. And in that document, starting at page 7, going through page 8, 9, and 10, there's significant amounts of discussion about KPX and the distortions, and right at page 7 we discuss the price of the electricity charged into KPX and the price purchased. And actually in that document. Do you suggest that we can do anything more than remand this to Commerce to provide a full consideration of this question about essentially not stop, not taking KPX's prices to KEPCO as a given? Your Honor, we do believe that there is substantial evidence on this record for you to make that finding to say the benefit should have been X and had, again, it's flushed out in our case brief to the Department where we've offered multiple different types of benchmarks, the marginal system prices. Would you have us make that fact finding? I think it's possible to make that fact finding, but certainly if the Court wasn't comfortable making that fact finding, it certainly should be remanded back to Commerce to actually conduct an appropriate cost analysis, as Your Honor suggests. But wouldn't that be an issue of substantial information? If we believe that the KPX price should have been factored into the analysis but wasn't, then that's a question of lack of substantial information. Correct. Commerce's decision to base its analysis to limit what chain in the cost distribution it looked at wasn't supported by substantial evidence, that there was substantial amounts of evidence on the record that demonstrated that had they gone all the way back and done a proper analysis of what's the actual cost associated with generating that electricity, they should have at least asked for the information, and they didn't. And we supplied large amounts of evidence on that issue that weren't addressed. And in fact, going again back to that system marginal price data that's on the record, we raised it in our case brief. In fact, we had asked Commerce to use it as an alternative benchmark and said if you're not going to examine the KPX data, at least you can use this. And even though it only reflects the variable cost, it doesn't include the capacity price. It doesn't include the capacity cost. It doesn't include an amount for profit. But even that would have resulted in a subsidy because it showed that there was a substantial difference between even the variable cost and the price that they paid, and we'd suggested that they use that as a benchmark. So it's possible that they could go there, but certainly, as Your Honor suggested, the evidence suggests that the cost element they were looking at does not accurately reflect the actual cost of generating the electricity, and they should have asked for the information, and they didn't. And they didn't multiple times. This is not a scenario where we asked once. We asked in November in response to the first questionnaire where we specifically laid out, in fact, again, this is not in the record, but it is in the record, but it's not in the appendix. It's public record 315, confidential record 378, and again, it starts at page 11, where, again, we go through why commerce should be looking at KPX, where the distortions in the system are, and we say, and I quote, KPX is thus not only another channel through which the Korean government actively intervenes in electricity prices, it also acts as another market regulator and as a repository of market data. It appears that KPX and not KEPCO is, in fact, the key actor in the Korean electricity market. KPX thus cannot be ignored, and the department must ask significantly more detailed questions regarding its role in the market. The department didn't ask any additional questions. It certainly didn't ask for the generator's cost of production data. It didn't ask for KPX's. To refresh my memory, did commerce conduct verification of this? It did not. It conducted verification in the corrosion-resistant case, which was the case underlying the Newport case. It just took the verification results from that case and applied it in this case. Okay. I think you said at the beginning of the argument that there's a third case in the wings. There is. It's currently stayed. Is it briefed here? It's in front of this court. I'd have to check if it was briefed. I don't recall off the top of my head. But there was three flat-rolled cases. There's corrosion-resistant steel, which was the Newport case. There's cold-rolled steel, which is this case. And then there's hot-rolled steel, which has currently stayed before this court pending resolution of this case. Okay. You're into your rebuttal time. If there are no other questions, I've reserved the balance of my time. Okay. Good morning, Your Honor. May it please the Court. After this Court's decision in New Court that came out this June, the remaining question for this panel is essentially whether or not commerce is required to essentially pierce the veil and go back through KPX and basically, Appellant is arguing, all the way down to a generator-by-generator level to determine whether or not the power that was consumed was actually purchased in accordance with market principles. What about the question of simply whether they adequately gave an answer for not doing that? Is that a possible issue before us today? Well, I think that the IDM sets forth their reasoning for not essentially piercing back to KPX. The only reason I see is they say it's irrelevant. They say that KEPCO's cost is what matters. They say that KEPCO's cost is what matters because they get the costs from KPX. And I think it's important to remember that there is set forth in our brief a significant series of statutes and regulations in Korea that require that the actual tariff schedule reflect the cost of the generation of the electricity. And in addition to all of those statutes and regulations, the government of Korea put over 1,000 pages of fiscal year 2014 data on the record. That's the cost to KEPCO, right? Correct. To purchase electricity. Yes. It's not the production cost of KPX. Right, but the statutes and regulations require that the actual purchase costs reflect the costs for the generators. And there's not been any assertion that... Where is that discussed in the opinion? Excuse me? Where is that discussed in the opinion? From the commerce or anybody else? Well, the IDM, and I'm citing specifically to Appendix 13083, does go through the way in which the costs are calculated. It does not specifically discuss all of the laws and statutes, but they were put in the record by the government of Korea. They're included in the joint appendix here, and I think it's reasonably discernible that commerce is looking at all of the statutes and regulations that Korea is pointing to in its response to the questionnaire, in addition, again, to all the financial information that specifically indicates that for the fiscal year 2014, and this is subject to business proprietary information, so I won't say the specific numbers, but the industrial sector in the year 2014 actually did recover more than 100% of its costs for the purchase of electricity during that year. And so, essentially, the question before the court is, what does the statute require? Does the statute require that commerce go further back down to a generator-by-generator level to determine whether or not a particular nuclear generator is recovering its costs when you look at the variable and the capacity? Is T-Max wholly owned by KEPCO? It's a government entity. I don't know that it's wholly owned by KEPCO. It's a government entity? It is certainly a government entity, Your Honor, which is why it's, of course, subject to the laws and regulations that require that the tariff schedule reflect the actual cost of generation. And I'd be happy to walk... Doesn't the statute require, if they're a government entity, that their costs be included in the analysis? So the statute says, and I believe the court's referring to the regulations at 3151.511, which is the question about whether or not the authority is purchasing in a consistent with market principles. And so here, that, I guess, would be a question of Chevron deference as to whether or not Department of Commerce properly determined that KEPCO was the authority at issue here as opposed to going back further to KPX. Again, for the reasons we set forth, we think that the fact that the statutory regulations of the government of Korea and also the financial data that was put onto the record by Korea establishing that the generators actually were recuperating their costs in 2014, that they weren't required to go further back. And I would point the court to the statute actually at issue here, not just the regulation at 19 U.S.C. 1677.5, which, excuse me, 5E, Roman at 4, and the standard that they're looking at here is the adequacy of remuneration determined in relation to prevailing market conditions. For the good or service being provided or the goods purchased. And a lot of the appellant's assertion, essentially it seems that it comes from what is kind of a logical leap between this idea that nuclear plants have higher startup costs, they are more expensive to construct and to get going, but once you construct them, they tend to make clean, lower cost energy. And then they quote to one footnote actually in a response from the government of Korea that says that, and it's worth noting that this document, it appears at tab 10 in the joint appendix, this document was a response from the government of Korea about why the 2012 National Assembly report is not something the Department of Commerce should rely on, explaining why they thought the data in that report was not reliable. And in that response, the government of Korea said that because that report related specifically to the top 100 industrial consumers of electricity, some of the data may be skewed because as the top 100 largest consumers, they may be able to, and I'll pull up the language for the court. I apologize, it's tab 8, I think I said tab 10, your honors. And it said appendix 11519, more specifically, if one consumes electricity when the load factor is low, e.g. at night, the electricity tariff decreases, since electricity could be generated by those using cheap fuels, e.g. nuclear power generators. So it's this idea that because an industrial client, especially the 100 largest industrial producers in the government in Korea, which were going to have more steady energy requirements, a large factory oftentimes will just be running 24 hours a day, or if you have huge energy requirements, you can set up your system in a way that ensures that you receive electricity at the lowest tariffs possible. The lowest rates and the pricing for KPX contemplates this. If KPX is a wholly owned subsidiary of KEPCO, then doesn't the analysis shift a little bit here? And aren't we now looking at whether KPX is adequately remunerated by the price set or what it receives from KEPCO? We don't know that until we do a cost analysis, or a cost analysis is done on KPX. Well, my understanding is that KPX operates as more of an intermediary, and the 20F response from the government of Korea sets forth... So they're selling the electricity. Right, they almost do sort of a bidding system. How do you know that they're being adequately remunerated in these cells? Well, I believe because as a government entity, they're subject to the laws and regulations that require that the generators actually... But we don't know that. That's what a CBD case is all about, to see what type of action the government has taken with respect to these industries. It sounds like you're saying, don't look at KPX because you don't have to, because I've already looked at them, and there's nothing going on there because they have to comply with the rules and regulations. I mean, that's what it sounds like you're saying. Is that what you're saying? No, Your Honor, we're saying that the government of... that the Commerce did an analysis to determine whether or not the actual costs were being recuperated, and the combination of the statutes and regulations that do require the government of Korea to ensure that the generators are being... are being recompensated, and the lack of any evidence on the record that they actually are not being compensated, and then also the financial fiscal year 2014 evidence that establishes that there actually were compensated for their costs in 2014 was sufficient to determine that there was not a countervailable subsidy available here. So if all that's correct, then you'd like for us to take the word of the Korean government that it's following its own laws and regulations? Absent evidence that they are not following the laws and regulations. But isn't that what a countervailing duty investigation is all about? To find out what's going on in the marketplace. To find out whether there's any countervailing subsidies that are benefiting a particular industry. Not... not so specifically or always, Your Honor. For example, I believe there's a... there's a decision that both our brief and the reply from the appellant cites the cold-rolled steal from Russia, and appellant cites it for the proposition that because Gazprom, which is the government entity in that circumstance, was found to be manipulating the prices, their commerce determined that it could not rely on the prices and so it went outside to another market to determine what prices it should charge for natural gas. Do you know whether KPX is manipulating prices here? So in that instance, the reason that commerce decided to go outside the country... Do we know? There's no indication that they are manipulating. Isn't that part of what this investigation should entail? That comes back, I guess, to the commerce's discretion as to whether... how far it has to go under the statute and whether or not it's an abuse of its discretion to take the laws and regulations of the government of Korea in conjunction, again, with this data that indicates that the actual generation costs were recovered in the fiscal year 2014 and any... absent any other evidence that KPX is not actually operating in accordance with those laws, whether or not it's a reasonable interpretation of the statute for commerce to not go back, again, almost to a generator-by-generator analysis to determine whether or not one particular nuclear generator somewhere in the country of Korea maybe is not actually recuperating its costs. And I think it also bears noting, you know, the statute says in accordance with market principles. In accordance with market principles does not necessarily mean free market or no company would ever operate at a loss on a given year, right? For example, a nuclear plant, which is incredibly expensive and a lot of upfront costs to actually get constructed and get going, baked into the... What's the percentage of electricity that's produced by or sold by KPX? They sell 100% of the electricity to PEPCO in the government. And am I remembering right from a chart that about 80% of the generating side is a KEPCO affiliate? I'm not sure... There's a little table with about 8 companies or 9 companies of which 5 or 6 have KEPCO in their name or are KEPCO. The percentages, I think, add to around 80%. I believe that may be correct, Your Honor, although I'm not exactly sure. And I would note that nuclear energy represents about 30% of the energy produced during 2014 pursuant to the 20th submission that was given by the government of Korea. So if the Court has no further questions... No. Okay, thank you. We would ask in accordance with the new Court decision that this Court affirm the finding of the Department of Commerce. Thank you. Okay, thank you. Mr. DeFrantisco, you have a little bit less than four minutes. You've got four and a half minutes. Great, thank you, Your Honor. Just quickly, a few points to Your Honor's question about whether KPX is wholly owned. This is in the appendix. It's Appendix 3137. At the top of the page it discusses the relationship of KPX to KEPCO and it says Korean Power Exchange and it says we and our six generating subsidiaries are member corporations of the Korean Power Exchange and collectively own 100% of its share capital. So yes, it is wholly owned. And to Your Honor's question, yes, you're correct. It's approximately, it's a little over 80% were the six generators. So KEPCO owns 85% of the generating capacity in Korea, wholly owns their complete subsidiaries. It owns KPX and then it distributes the electricity. Is that also at page 83137 or elsewhere? Do you have a record site for the 80% figure? I do not, but I can get it. But to the point I think Your Honor was asking about, in the new court decision, when the court is examining what does remuneration mean, what does it mean to be adequately remunerated, the court looks at other types of definitions and it looks at things like just equivalent, fair compensation, fair value and the arguments we were making to correctly examine whether the price that KEPCO charged the steel producers was adequately remunerated, you ought to look at the actual cost associated with generating the good that's being provided. In order to do that, you either have to gather the data directly from KPX's generators or at least get the data from KPX. I mean, that's the basis of the statute. That's what the statute directs commerce to look at. The statute directs commerce to examine whether a subsidy is being provided either directly or indirectly. Now, the argument we were making was what benchmark should they be using when measuring the amount of the benefit here? And the correct benefit, the correct benchmark should have been the actual cost associated with generating the electricity. And they didn't look at that. They didn't ask the question, they didn't gather the data and they stopped their analysis. And so one of the points that we heard was that, well, KEPCO more than covered its cost. Again, in our case brief, we dispute that if you actually look at KEPCO's financial statement, it shows that the revenue generated from electricity sales relative to the cost associated with that electricity didn't adequately remunerate. It was about 98%. There's a reconciling item afterward where additional revenue is booked to push it up to 100%. It's not clear where that reconciling item came from or how it was Again, if Commerce didn't blind itself to the full record to examining going all the way back to the generating cost, they would have properly calculated a benefit and a benchmark and would have found that the subsidy is countervailable. And so with that, Your Honors, we will rest and we ask that Your Honors remand back to the Department of Commerce for a proper analysis. Thank you. We thank all the parties for their arguments this morning. This Court now stands in recess.